UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LISA JENKINS,
     o/b/o D.B., a child,
     DANIEL BAILEY,

        Plaintiff,

                             Case No.:  05-CV-70978-DT

vs.

                             HON. VICTORIA A. ROBERTS
                             MAG. JUDGE WALLACE CAPEL, JR.

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant,
_____/

## REPORT AND RECOMMENDATION

**I.**      **RECOMMENDATION**

     It is recommended that the Court grant Defendant's Motion for Summary Judgment, and enter judgment for Defendant.

**II.**    **REPORT**

     This is an action for judicial review of the Defendant Commissioner's final decision denying Lisa Jenkins' application for supplemental security income [SSI] on behalf of her son, Daniel Bailey.  Plaintiff's mother filed for SSI benefits on May 30, 2002, alleging that he has been disabled since January 17, 2002,[1] due to "lead levels, hyperactivity, [and] behavioral problems."  (TR 29, 40-42, 53).   The Social Security Administration [SSA] denied benefits initially on August 12, 2002.

---

[1]Plaintiff's mother also reported that her son's disability began in September 1997 on the child disability report.  (TR 53).

(TR 29-33).   A de novo hearing was held on July 9, 2004, before Administrative Law Judge [ALJ]

Perez.  (TR 125-43).   In a decision dated September 21, 2004, the ALJ found that Plaintiff was not

disabled.  (TR 12-17).   The ALJ's decision became the Commissioner's final decision when the

Appeals Council denied review on January 18, 2005.  (TR 3-5).  The Plaintiff  has commenced this

action for judicial review.

     A.     **<u>TESTIMONY</u>**

          1.     **Lisa Jenkins' Testimony**

Plaintiff's mother testified at the hearing.  (TR 127-37, 139-42).  She stated that her son,

Daniel Bailey, was eleven years old at the time of the hearing, and was born on July 2, 1993.  (TR

128).  She testified that Daniel suffers from emotional problems, which she described as behavioral.

<u>Id.</u>  She stated that he exhibits problems at home, school, and "[b]asically everywhere [they] go."

<u>Id.</u>  She explained that at home and school he is "uncontrollable" and "very hyper."  (TR 128-29).

She testified that he attends Henry Ford Academy in Allen Park and was in fourth grade the prior

year.  (TR 129).  She reported that he had "[b]ehavioral, emotional, and some learning" problems

in school.  <u>Id.</u>  She stated that he was suspended about five times during the last school year.  <u>Id.</u>

She also testified that there were about four other "situations" where she had to go up to the school.

(TR 130).  She explained that he was suspended for "[f]ighting [and] disruptive behavior."  <u>Id.</u>  She

stated that he is defiant toward her and his teachers.  <u>Id.</u>   She stated that the four other times she

went to the school on other days to get him for "getting into it with another student or he was defiant

with a teacher or one of the aides or somebody in the office."  (TR 131).  She stated that at times

Daniel's teacher or the assistant would take him home.  <u>Id.</u>

Plaintiff's mother reported that Daniel's grades are the best that they have ever been this year. Id. She reported that he has improved, but he is still not functioning at the proper grade level. (TR 131-32, 136). She stated that his teachers report that he is functioning at a third and fourth grade level. (TR 132). She reported that he currently has completed fifth grade and is scheduled to begin sixth. (TR 136). She stated that he is enrolled in math, science, and language arts special education classes. Id.

Plaintiff's mother stated that she lives alone with her four children, Charles, age nineteen, Giovanni and Jovanni, twins, age five, and Daniel. (TR 132-33). She stated that Daniel gets along with his brothers "somewhat," and can be rough with the younger ones. (TR 133). She stated that Daniel will occasionally take out the garbage or sweep. Id. She stated that she has to tell him to do these chores. Id. She reported that Daniel does not work part-time, but that she has encouraged him to do some work for older people in their neighborhood. (TR 137).

She testified that Daniel does his homework on "[s]ome days," but on others it is "a battle." (TR 134). She stated that he is taking his medication, Concerta once a day as prescribed by his pediatrician, Dr. Kahn. Id. She testified that the Concerta is for attention deficit hyperactivity disorder [ADHD], which she noticed when he first began school. (TR 137). She stated that the pediatrician sees him "[a]t least once a month or every two months." (TR 134). She stated that she also had Daniel see a therapist at school a couple times, but she has not continued his treatment due to problems with her insurance. (TR 134-35).

She reported that his personal hygiene in school is "pretty good." (TR 139). She then stated that his personal care at home is "half and half." (TR 141). She stated that bed-wetting is still a

3

problem.  Id.  She also stated that playing with fire has not been a problem since two prior incidents. (TR 142).

She reported that he sometimes follows her instructions and rules, but at other times he does not.  (TR 140).  She stated that he goes to the store by himself and gets involved in sports and games at home.  Id.  She reported that he does not see his father and does not get along with other adults well.  Id.

### 2.     Daniel Bailey's Testimony

Plaintiff testified at the hearing as well.  (TR 135-41).  He stated that he is four foot and eleven inches tall.  (TR 135).  He also reported that he weighs ninety-three pounds.  Id.

He testified that his "[r]eading is good."  (TR 136).  Daniel further testified that he is able to communicate his needs to his teachers at school and tell them his problems.  (TR 137).  He stated that he "[s]ometimes" follows his teacher's instructions.  Id.  He stated that he "know[s] the problem, but sometimes [he is] just scared."  Id.  He clarified that he understands his teachers and follows the rules.  (TR 137-38).

Daniel testified that he takes part in recess and sports at school.  (TR 138).  He reported that he gets along well with his classmates and has friends at school.  Id.  He reported that he is no longer involved in club activities at school, but he used to participate in Project Link, an after school program, but he was "kicked out" and then the project ended.  (TR 138-39).  He explained that Project Link is just like school, "but you can like just play basketball, go to certain classes, like cheerleading for the girls, and stuff like that."  (TR 139).

He stated that he reads sometimes and is able to talk on a telephone.  (TR 139-40).  He stated that he has friends in the neighborhood and gets along with them well at times and not so well or

"bad" at other times.  (TR 140).  His mother stated that he fights with them and he explained that

that is why he stated "good sometimes."  (TR 140-41).  He stated that he has pets and does not

belong to any clubs in his neighborhood.  (TR 141).  He explained that he used to go to the YMCA

with his grandmother, but he no longer does same due to a lack of transportation.  Id.  His mother

stated that he also attends church.  Id.

### B.     MEDICAL EVIDENCE & SCHOOL RECORDS

Examinations of the Defendant's motion for summary judgment and the ALJ's decision

reveal that an additional recitation of the Plaintiff's medical evidence and school records would be

repetitive.  The pertinent record medical evidence relied upon by this Court is fully articulated in the

Analysis.[2]

### C.     ALJ'S CONCLUSIONS

After reviewing the testimony presented at the hearing and the medical evidence in the record,

the ALJ found that Plaintiff suffered from ADHD and a learning disorder, which are "severe," but that

he does not meet the criteria of any of the listed impairments in Appendix 1, Subpart P, Regulations

No. 4.  (TR 17).  Thus, the ALJ concluded that Plaintiff is not entitled to childhood SSI disability

benefits.

### D.     ANALYSIS

Plaintiff filed a Complaint on March 21, 2005.  Plaintiff did not file a Motion for Summary

Judgment.

> [A] complaint filed pursuant to 42 U.S.C. § 405(g), appealing the Secretary's final
> decision denying Social Security disability benefits, may not be dismissed for failure
> of the Plaintiff to prosecute when the Plaintiff fails to file a summary judgment

---

[2]See Subpart D, infra.

5

motion as requested by the Magistrate. By so holding, this Court does not intend to approve of the Plaintiff's neglect in failing to comply with the Magistrate's request. However, as § 405(g) does not require the filing of motions or briefs for the Court to render a decision on the merits, the failure to file such motions cannot be the basis of a dismissal for failure to prosecute.  Stated another way, once the Plaintiff has filed a complaint stating his grounds for appeal from the Secretary's decision, he has done all that is required of him by § 405(g). Further, once the Secretary has filed a transcript of the record, all that is required by § 405(g) of both parties has been done.

Kenney v. Heckler, 577 F.Supp. 214, 216 (N.D.Ohio 1983).

Plaintiff's mother contends in the Complaint that her son began counseling at D-I-C Children's Center in September 2004.[3]  She states that his medication has changed to Allegria.[4] Additionally, he was placed on "homebound" in October 2004, which means that he has six hours of schooling each week, broken down into two, three hour days.[5]  She stated that his condition has not changed; rather, the condition is worse and "he is sometimes a threat to himself" and others.[6] Plaintiff's mother further reported that he is going to take anger management classes.[7]  She stated that he wets the bed as a result of his ADHD and reads at a fourth or fifth grade level.[8]  She also requests that the case be referred to a different ALJ.[9]

---

[3]Plaintiff's Complaint filed March 21, 2005 (hereinafter "Plaintiff's Complaint").

[4]Id.

[5]Id.

[6]Id.

[7]Id.

[8]Id.

[9]Id.

6

Defendant did file a Motion for Summary Judgment and contends that the ALJ's decision is supported by substantial evidence.[10]  The matter is now ready for decision.

1.      __Standard of Review__

The standard for granting childhood disability is more stringent subsequent to the passage of the Personal Responsibility and Work Opportunity Reconciliation Act in 1996.

> An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i).

In order to determine whether a claimant is disabled under this most recent legislation, the ALJ is now required to follow a three-step process outlined in the regulations promulgated under the Social Security Act.  See 20 C.F.R. § 416.924.  Specifically, to grant disability benefits, the ALJ must affirmatively determine the following:  (1) that the child has not engaged in substantial gainful activity over the last twelve months; (2) that the child suffers from one or more severe impairments; and, lastly (3) that the child's impairment meets, medically equals, or functionally equals the severity of a listed impairment.  See 20 C.F.R. §§ 416.924(a)-(d).  At the third step, if the child does not have an impairment which medically meets or equals a listed impairment, or is functionally equal in severity to a listed impairment, the child will be found not disabled.  20 C.F.R. § 416.924(d).

---

[10]Defendant's Motion for Summary Judgment and Brief filed December 21, 2005 (hereinafter "Defendant's Brief"), at pages 8-12.

7

In order to meet a listing, Plaintiff's disability "must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 CFR § 416.926a. "The domains we use are: (i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and, (vi) Health and physical well-being." 20 CFR § 416.926a(b)(1). 20 CFR § 416.926a provides, in pertinent part:

(2) Marked limitation.

(i) We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme."

It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

(ii) If you have not attained age 3, we will generally find that you have a "marked" limitation if you are functioning at a level that is more than one-half but not more than two-thirds of your chronological age when there are no standard scores from standardized tests in your case record.

(iii) If you are a child of any age (birth to the attainment of age 18), we will find that you have a "marked" limitation when you have a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score. (See paragraph (e)(4) of this section.)

(iv) For the sixth domain of functioning, "Health and physical well-being," we may also consider you to have a "marked" limitation if you are frequently ill because of your impairment(s) or have frequent exacerbations of your impairment(s) that result in significant, documented symptoms or signs. For purposes of this domain, "frequent" means that you have episodes of illness or exacerbations that occur on an average of 3 times a year, or once every 4 months, each lasting 2 weeks or more. We may also find that you have a "marked" limitation if you have episodes that occur more often than 3 times in a year or once every 4 months but do not last for 2 weeks, or occur less often than an average of 3 times a year or once every 4 months but last longer than 2 weeks, if the overall effect (based on the length of the episode(s) or its frequency) is equivalent in severity.

8

20 CFR § 416.926a(e).

> (3) Extreme limitation.
> (i) We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Extreme" limitation also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

20 C.F.R. § 416.926a(e).

This Court's review of the ALJ's conclusions is limited.  The findings of the ALJ regarding Plaintiff's disabled status are conclusive if supported by substantial evidence based on the record as a whole.  42 U.S.C. § 405(g) (1997).  Substantial evidence means such evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  It is more than a scintilla of evidence, but less than a preponderance of evidence.  Brainard v. Sec'y of Health and Human Servs., 889 F.2d 679, 681 (6th Cir. 1989).  This standard presupposes that there is a "zone of choice" within which the ALJ may make a decision without being reversed.  Felisky v. Bowen, 35 F.3d 1027, 1035 (6th Cir. 1994).  Even if the court might arrive at a different conclusion, an administrative decision must be affirmed if it is supported by substantial evidence.  Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986).  Finally, consideration of the whole record does not mean that the ALJ must mention or comment on each piece of evidence submitted.  Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).  "Thus, the Court 'may not try the case *de novo,* nor resolve conflicts in evidence, nor decide questions of credibility.'" Garner v. Heckler, 745 F.2d 383, 387 (6th Cir.1984).  Trudell ex rel. Bushong v. Apfel, 130 F.Supp.2d 891, 895 (E.D.Mich. 2001).

9

a.      **Additional Evidence**

Plaintiff states that her son has been placed in counseling and "homebound" schooling, that his medication has been changed, that his condition has worsened, and that he is to begin anger management classes.[11]  This constitutes new evidence that was not before the ALJ at the time of his September 21, 2004, decision.

This Court recognizes the rule in this circuit regarding such additional evidence.  The Sixth Circuit has held that the Court does not have to review new evidence unless good cause has been shown and the new evidence is material.  Cline v. Commissioner of Social Sec., 96 F.3d 146, 148 (6th Cir. 1996).  In Cline, it was the claimant's

> primary argument [] that because the Appeals Council considered his new psychiatric evidence, the district court was required to do so as well.  He is mistaken.  In Cotton v. Sullivan, 2 F.3d 692, 695-96 (6th Cir.1993), this court decided a case very much like Cline's, holding that where the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision.  The district court can, however, remand the case for further administrative proceedings in light of the evidence, if a claimant shows that the evidence is new and material, and that there was good cause for not presenting it in the prior proceeding.  Id. at 696.

Id.  Plaintiff has failed to argue any good cause or materiality regarding any additional evidence not before the ALJ.  Further, she has not provided any proof of the alleged additional evidence.  "[T]he appropriate remedy in such a case is to initiate a new claim for benefits alleging an onset date consistent with the aggravation of the condition."  Sizemore v. Sec'y of Health and Human Servs., 865 F.2d 709, 712 (6th Cir. 1988) (citations omitted).

---

[11]Plaintiff's Complaint.

**b.      Reading Level, Bed-wetting and ADHD**

Plaintiff mentions in the Complaint that her son reads at a fourth or fifth grade level and wets the bed as a result of his ADHD. However, the ALJ was aware of this. The ALJ specifically acknowledged Plaintiff's mother's testimony that "his grades have improved but he functions at the third and fourth grade level in some subjects." (TR 13). Further, the ALJ noted that "[h]is teacher commented in the first marking period that Claimant was he was [sic] 'truly improving academically and socially,'" but that when his attendance became a problem, his grades suffered. (TR 15). The ALJ also stated that "[t]esting has shown that Claimant is of normal intelligence." Id. Further, the ALJ noted that Plaintiff did well when he attended school and in 2002, he had "A's and B's in reading, C's in math, B[']s and C[']s in Social Studies, and A's and B's in Science." Id. As Defendant points out, the ALJ specifically discussed all six domains and found no marked or extreme limitations.[12]

However, as to bed-wetting, the ALJ did not specifically discuss same. On the daily activity sheets, Plaintiff's mother reported "bed-wetting often plays with fire, also set mop - a house [sic] on fire (fights all the time)," in response to "problem behavior." (TR 63). Presumably "often" is in reference to frequency of bed wetting. She reiterates that he wets the bed in a summary of his problems. (TR 67). However, this is the only reference, other than her hearing testimony regarding same. (TR 141). In fact, on July 18, 2002, "[a]ppetite and sleep are both reported as good," with no reference to bed-wetting. (TR 90). Likewise on March 12, 2002, bed-wetting is not mentioned and it is reported that "[h]e sleeps alone in his bedroom." (TR 113).

---

[12]Defendant's Brief at pages 10-12.

The Sixth Circuit Court of Appeals has not dealt directly with bed-wetting and ADHD as it relates to childhood SSI benefits.  However, in <u>McGuire for McGuire v. Shalala</u>, 1994 WL 746484, *10 (E.D. Tenn.) (unpublished), the Plaintiff had ADHD as well as other problems and her physician "also observed she had nightmares related to being attacked and severely injured by a dog, and enuresis."[13]  Nevertheless, the denial of benefits was upheld.  <u>Id.</u> at *13.  In other cases outside our jurisdiction, a denial of benefits has also been upheld where evidence of bed wetting was found. <u>Jaramillo ex rel. Mesa v. Comm'r of Soc. Sec.</u>, 130 Fed.Appx. 557, *560 (3rd Cir. 2005) ("medical evidence establishe[d] that the claimant has the following severe impairment:  history of Guillain-Barre syndrome, transient hand tremors, nocturnal enuresis, ADHD, and a learning disorder."); <u>Parsons v. Barnhart</u>,  2003 WL 22136299, *2 (D.Del. 2003) (unpublished) ("Plaintiff's behavior included tantrums, bed-wetting, arguing with his mother and declining school performance."); <u>Machadio v. Apfel</u>, 2001 WL 477248, *2, 6 (E.D.N.Y. 2001) (unpublished ) (Plaintiff's "ability to care for herself was adequate except for nocturnal enuresis. . . . Although she experienced nocturnal enuresis, this did not rise to the level of a marked limitation."); <u>Lewis v. Barnhart</u>, 2001 WL 1586736, *1 (E.D.La. 2001) (unpublished) ("Plaintiff had a history of recurrent nocturnal enuresis and aggressive behaviors."); <u>Steele v. Shalala</u>, 1994 WL 738093, *2 (W.D.Va. 1994) (unpublished) (Plaintiff was prescribed medication "for sleep problems and bed wetting."); <u>Hicks v. Shalala</u>, 1994 WL 746600, *2 (W.D.Ark. 1994) (unpublished) (Plaintiff  "suffer[ed] from nocturnal enuresis or bed-wetting. . . . [but] [h]is bed-wetting is much less frequent than before, and he is able to stay on task much better than was previously noted.").

---

[13]Enuresis is "[u]nconscious or involuntary urination, either while awake or asleep. However, the term usually means the discharge of urine during sleep, as in the bed wetting of children. The better term for the latter is nocturnal enuresis."  <u>Id.</u> at *10, n. 8.

12

Other cases outside our jurisdiction show evidence of bed-wetting and other problems which led to remands. However, these cases can be distinguished. In Escardille v. Barnhart, 2003 WL 21499999, *1 (E.D.Pa. 2003), "[a]t ten years old [Plaintiff] was still wetting his bed and having episodes of "occasional encopresis if not reminded to go to the bathroom."[14] However, the case was remanded because "the ALJ failed to explain if she gave consideration to the treating physician's report, [] the siblings' testimony was unreasonably found to be not credible, and [] unreasonable reliance was given to plaintiff's testimony." Id.

In Peterson v. Massanari, 2001 WL 831318, *12 (N.D.Ill. 2001) (unpublished), the case was remanded where the ALJ made

> no assessment of reports that, at 28, Plaintiff still is wetting his bed and playing with toys, that Plaintiff spends much of his time shut up in his room, that Plaintiff's "friends" are teenagers half his age with whom he mostly plays computer games, that previously his wife and now his mother have to fill out application forms for him, that he is perceived to exist in "different age groups," acting one day like a 14-year-old and another day like a 17-year-old, with no predicability [sic] in his changes of behavior. (R. 221-22, 224, 228, 243.)

However, the district court also remanded the case due to the ALJ's failure "to discuss significant evidence in the record, the ALJ's opinion contains two further problems. First, the hypothetical questions posed by the ALJ to the vocational expert failed to take into consideration the limitations noted in the reports other than residual functional capacity evaluations by the SSA consultants." Id. at *12-13. The court also found that "the ALJ's opinion suggests that the ALJ may have overemphasized the significance of drug or alcohol use in Plaintiff's condition." Id. Although, the ALJ in the present case also failed to assess Plaintiff's bed wetting, there is no evidence that the

---

[14](citations omitted)

present Plaintiff had other problems to the extent of those the plaintiff in <u>Peterson</u> exhibited. Further, the ALJ in <u>Peterson</u> also made other errors not present here.

In <u>King v. Massanari</u>, 170 F.Supp.2d 1171, 1177 (N.D.Ala. 2001), the district court remanded the case where the following evidence was present: "October 12, 1998, meeting with Ms. Smith: 'angry' affect--plaintiff still wetting bed almost nightly--frequently interrupts mother--voiced hatred of his life and belief he would be better off dead; [] November 11, 1998, meeting with Mr. Heard: 'anxious' affect-- sad/depressed--negative self image--low self-esteem--nightly bed wetting-- suicide threat."[15]  The district court found that, "the ALJ failed to accord deference to treating physicians where plaintiff had "been treated by more than five professionals for bipolar disorder." <u>Id.</u> at 1180.  In the present case there is no evidence or allegations that the ALJ neglected to defer to the opinion of treating physicians.  In fact, there is no evidence presented of a treating physician's opinion in the case at hand.

In <u>Roelandt ex rel. Roelandt v. Apfel</u>, 125 F.Supp.2d 1138, 1140 (S.D.Iowa 2001), "Plaintiff's father described the child 'as violent, and said he talked about killing himself. He went on to say that William had been fighting in school and was wetting the bed about three times a week.'"  The district court remanded the case, holding that

> [r]egarding the ability to attend and complete tasks, the written and oral testimony from Plaintiff's teachers and father provides substantial evidence that Plaintiff is not able to focus and maintain his attention.
> Likewise, substantial evidence in this record supports a finding that Plaintiff has serious, if not very serious, problems interacting and relating with others.
> The ALJ was concerned that Plaintiff's medication is effective in controlling his behavior, and that it is only when the medication is not taken that Plaintiff is out of control. While there is some evidence to support that conclusion, when the record is read in its entirety it becomes clear that the medication is not effective on a

---

[15](footnote omitted).

14

consistent basis. Also, Dr. Huesgen wrote that while an increased dosage of medication may have stabilized some symptoms, Plaintiff became more irritable, depressed and withdrawn. Both Plaintiff's father and his teachers testified that even when Plaintiff takes his medication correctly, it is not consistently effective. The records submitted to the Appeals Council indicate that some of Plaintiff's behavior problems may be due to a seizure disorder. If that is true, perhaps different medication will be effective in controlling Plaintiff's problems. That situation can be addressed when the Commissioner initiates a periodic review of Plaintiff's eligibility to continue receiving benefits. In the meantime, the evidence in this record clearly supports only one finding, namely that Plaintiff functionally meets the listings of impairments and is entitled to the benefits for which he has applied.

Roelandt, 125 F.Supp.2d at 1148. In the present case, there was evidence that the Plaintiff did better when he attended school and took his medication. (TR 16, 17).

In Hall ex rel. Hyman v. Apfel, 1999 WL 350082, *4 (E.D.La.,1999) (unpublished), "plaintiff ha[d] oppositional defiant disorder and anuresis [bed wetting]. (Tr. 236-239)."

The Court [found that] considering the apparent deterioration in this child's ability to function normally and responsibly, it was the duty of the ALJ to have ordered an updated medical evaluation of this child's mental health in order to develop this record. This conclusion is further supported by the fact that the record is unclear as to the types of medication and the reasons for their being prescribed. Hyman was allegedly on Ritalin three times a day. (Tr. 253). Furthermore, a review of the examination of plaintiff and the ALJ's questioning of Hyman leaves the Court convinced that the ALJ failed to examine the plaintiff and her mother sufficiently concerning these problems.

Id. at *5. The present case is in stark contrast, where the ALJ found that Plaintiff's condition was improving with medication and the *evidence before him at the time of the hearing*, not deteriorating as in Hall.

Therefore, the ALJ's failure to mention Plaintiff's bed wetting is harmless error. Many courts have found that bed-wetting did not rise to the level of a marked limitation. Further, although other courts have considered bed-wetting upon issuing a remand, those cases can be distinguished

15

and deal with additional issues not presented here. It bears repeating that as to the additional evidence referenced by Plaintiff's mother in the Complaint that "the appropriate remedy in such a case is to initiate a new claim for benefits alleging an onset date consistent with the aggravation of the condition." Sizemore, 865 F.2d at 712.

Lastly, Plaintiff's mother requests a new ALJ because ALJ Perez let her son's case "fall through the cracks," and his "case wasn't even looked at."[16] In Howard v. Sec'y of Health and Human Servs., 932 F.2d 505, 509 (6th Cir. 1991), the Sixth Circuit articulated its position on such "aspersions" well:

> This suggestion that bigotry underlay the ALJ's determination that [Plaitniff] was not eligible for benefits, a claim completely unsupported in the record before this court, was not well received by this panel and will not be countenanced in the future by this court. Counsel are advised that personal aspersions, whether they be cast at opposing counsel or members of the judiciary, have no place in argument before us unless they are strictly pertinent to a legal issue, such as the imposition of Rule 11 sanctions or claims of judicial or prosecutorial misconduct.

## III.   **CONCLUSION**

For the reasons stated, I find that the ALJ's decision denying Plaintiff benefits is substantially supported in the record. Accordingly, I respectfully recommend that the Court **GRANT** Defendant's Motion for Summary Judgment, and enter judgment for Defendant.

Pursuant to Fed.R.Civ.P. 72(b) and 28 U.S.C. § 636(b)(1), the parties are hereby notified that within ten days after being served with a copy of the recommendation they may serve and file specific, written objection within ten days after being served with a copy thereof. The parties are further informed that failure to timely file objections may constitute a waiver of any further right of

---

[16]Plaintiff's Complaint.

16

appeal to the United States Court of Appeals.  <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981).

In accordance with the provisions of Fed.R.Civ.P. 6(b), the court in its discretion, may enlarge the period of time in which to file objections to this report.


<u>s/Wallace Capel, Jr. </u>

**WALLACE CAPEL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**Dated:**  <u>March 23, 2006 </u>

17

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

## CERTIFICATE OF SERVICE

I hereby certify that on <u>March 23, 2006</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: <u>James A. Brunson</u>,

and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participant(s): <u>Daniel Bailey, c/o Lisa Jenkins, and the Social Security Administration</u>.

<u>s/James P. Peltier</u>

United States District Court

Flint, Michigan 48502

810-341-7850

E-mail: pete_peltier@mied.uscourts.gov

18